MIDWEST MESSENGER ASSOCIATION, AN UNINCORPORATED
ASSOCIATION, APPELLANT, V. ROBERT M. SPIRE, ATTORNEY
GENERAL OF THE STATE OF NEBRASKA, ET AL., APPELLEES.

393 N.W.2d 438

Filed September 19, 1986.   No. 85-391.

Anthony S. Troia, for appellant.

Robert M. Spire, Attorney General, and Mel Kammerlohr, for appellees.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

BOSLAUGH, J.

Midwest Messenger Association, an unincorporated association, commenced this action to obtain a declaratory judgment that Neb. Rev. Stat. § 2-1221 (Cum. Supp. 1984) is unconstitutional and to enjoin the defendants from enforcing the statute. The defendants are the Attorney General of Nebraska, the county attorney of Douglas County, Nebraska, the sheriff of Douglas County, and the chief of police of the city of Omaha, Nebraska.

All of the defendants filed general demurrers to the petition, which were sustained. The plaintiff elected to stand on its petition, which was then dismissed. The plaintiff has appealed.

The plaintiff has assigned as error that (1) the trial court erred in sustaining the demurrer of the defendants and (2) the court erred in not granting the plaintiff the requested declaratory relief.

The petition alleged:

[T]he principal business of the Plaintiffs is, for a fee, to accept, transport and deliver money to purchase parimutuel tickets at licensed racetracks within and outside of the State of Nebraska for and on behalf of clients who are legally competent to purchase said tickets but who are unable to be personally present at said racetracks. That Plaintiffs have operated said businesses for the past six years.

Section 2-1221 provides:

Except as provided in section 2-1221.01, whoever directly or indirectly, accepts anything of value to be wagered or to be transmitted or delivered for wager in any parimutuel or certificate system of wagering on horseraces, or delivers anything of value which has been received outside of the enclosure of a racetrack holding a race meet licensed under Chapter 2, article 12, to be placed as wagers in the parimutuel pool or certificate system of wagering on horseracing within such enclosure shall be guilty of a Class II misdemeanor.

The plaintiff contends that § 2-1221 is unconstitutional because it (1) impairs the right of members of the appellant to freely contract with their clients, (2) is unconstitutionally vague

and overbroad in violation of due process of law, and (3) denies equal protection of the law in violation of both the state and federal Constitutions.

An action for a declaratory judgment is an appropriate remedy for determining the validity, construction, or interpretation of a statute. *Mullendore v. School Dist. No. 1, ante* p. 28, 388 N.W.2d 93 (1986); *Meyerkorth v. State,* 173 Neb. 889, 115 N.W.2d 585 (1962); *Dill v. Hamilton,* 137 Neb. 723, 291 N.W. 62 (1940).

In reviewing an order sustaining a general demurrer, "we are required to accept as true all the facts which are well pled, together with the proper and reasonable inferences of law and fact which may be drawn therefrom, but we do not accept as true the conclusions of the pleader." *Reimer v. K N Energy, Inc., ante* p. 142, 146, 388 N.W.2d 479, 482-83 (1986). If liberal construction of a petition indicates that it states a cause of action against the defendant and in favor of the plaintiff, a demurrer thereto should be overruled. *Dixon v. Reconciliation, Inc.,* 206 Neb. 45, 291 N.W.2d 230 (1980).

The first issue is whether, as alleged, § 2-1221 impairs the appellant's right to contract, in violation of the 14th amendment to the federal Constitution.

In *Nebbia v. New York,* 291 U.S. 502, 523, 54 S. Ct. 505, 78 L. Ed. 940 (1934), the U.S. Supreme Court stated:

> Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest.

Clearly, the Legislature is empowered to regulate and restrict the right to contract to preserve and protect the public health, safety, or welfare of the citizens of this state. *United States Brewers' Assn., Inc. v. State,* 192 Neb. 328, 220 N.W.2d 544 (1974).

In considering the validity of a statute challenged as impairing the right to contract, we must determine if the statute does in fact bear some reasonable relationship to its proposed ends. *United States Brewers' Assn., Inc., supra.* See, also, *Nebbia v. New York, supra.*

Prior to its amendment in 1984, § 2-1221 prohibited the same activity when done for a fee. § 2-1221 (Reissue 1983).

In *Pegasus of Omaha, Inc. v. State*, 203 Neb. 755, 280 N.W.2d 64 (1979), § 2-1221 as it read prior to the 1984 amendment was held to be constitutional against allegations that it deprived the plaintiff messenger service of its beneficial and lawful business without due process of law. At the heart of the plaintiff's argument in that case was the contention that while its services were subject to regulation, the Legislature was without power to absolutely prohibit an otherwise lawful occupation. Recognizing that article III, § 24, of the Nebraska Constitution empowered the Legislature to enact laws to license and regulate wagering on horseraces, we concluded that "[t]he activity of Pegasus is so intertwined with gambling that, under its constitutional power to regulate, the Legislature may ban messenger services operated for a fee from accepting bets and conveying the bets to a licensed racetrack." *Pegasus of Omaha, Inc., supra* at 759, 280 N.W.2d at 67.

As support for the decision in *Pegasus*, we relied on *Finish Line Express, Inc. v. City of Chicago*, 72 Ill. 2d 131, 379 N.E.2d 290 (1978). In that case the Illinois Supreme Court upheld the validity of a statute nearly identical to § 2-1221 (Reissue 1983). The *Finish Line* court concluded that the statute was a proper exercise of the plenary police power to regulate gaming activity because of a long list of reported problems with the messenger services, including booking of bets, failure to pay off winners, involvement of organized crime, and reduced track attendance and betting, resulting in lost revenue to the state.

Similarly, in *Nebraska Messenger Services Ass'n v. Thone*, 478 F. Supp. 1036 (D. Neb. 1979), *aff'd* 611 F.2d 250 (8th Cir. 1979), § 2-1221 (Cum. Supp. 1978), substantially the same statute challenged in *Pegasus, supra*, was upheld against due process and equal protection arguments. In concluding that the statute was reasonably related to legitimate state ends, the

federal district court stated at 1038:

> No one would question that the State of Nebraska has the power to regulate gambling in the interest of the public health, safety, and general welfare. Although the messenger services may not be gambling *per se*, such businesses are closely intertwined with gambling. Due to this close relationship, the Nebraska Unicameral could reasonably conclude that the public could only be protected from some of the evils of gambling by abolishing messenger services. For example, the Legislature may have reasoned that messenger services increase the risk of illegal bookmaking.

Section 2-1221 (Cum. Supp. 1984), now in effect, differs from the statute reviewed in *Pegasus, supra*, and *Nebraska Messenger Services Ass'n, supra*, in the omission of the "for a fee" language. This change was made in response to the messenger services' policy changes following enactment of the original statute in 1977. Miscellaneous Subjects Committee Hearing, L.B. 915, 88th Leg., 2d Sess. 42-43 (Feb. 10, 1984). At that point, in an attempt to remain in business, the appellant's members began to collect, as consideration from their clients, 10 to 15 percent of the winnings from winning tickets only, instead of charging a fee for every bet to be made at the track. *Id.*

The legislative history of the current § 2-1221 shows that a number of legitimate state ends were considered in the decision to amend the statute. Among the concerns expressed about the continued operation of the messenger services were the potential for infiltration by organized crime, which could result in illegal bookmaking; the difficulty in policing messenger service activities; wagers placed with the services that never reached the track; and the creation of significant law enforcement problems in communities where the services are operated.

Also of concern was the economic impact on state revenues from decreased attendance and booking of bets. As stated in *Finish Line Express, Inc. v. City of Chicago*, 72 Ill. 2d 131, 140, 379 N.E.2d 290, 293 (1978): "[I]t is clear that the State may utilize its police power to protect its sources of revenue and assure collection of taxes."

In this case, as in *Pegasus of Omaha, Inc. v. State*, 203 Neb. 755, 280 N.W.2d 64 (1979), we conclude that § 2-1221 was a proper exercise of the police power. Given the dangers presented to the Legislature, the prohibition of messenger-type services is reasonably related to protection of the public's safety and welfare. Elimination of the fee requirement has not made the statute any less reasonably related to those ends.

The next issue is whether § 2-1221 is unconstitutionally vague and overbroad.

As acknowledged by the appellant, *State v. Frey*, 218 Neb. 558, 561-62, 357 N.W.2d 216, 219 (1984), sets out the standards by which we determine if a statute is vague or overbroad:

> *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982), teaches that in a facial challenge to the overbreadth and vagueness of a law, that is, in this context, a claim that the law is invalid in toto and therefore incapable of any valid application, our first task is to determine whether the enactment reaches a substantial amount · of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail. We are then to examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, uphold the challenge only if the enactment is impermissibly vague in all its applications. In order to have standing to challenge a vague statute, one must not have engaged in conduct which is clearly proscribed by the statute, and cannot complain of the vagueness of the law as applied to the conduct of others.

See, also, *In re Interest of Siebert, ante* p. 454, 390 N.W.2d 522 (1986); *State v. Sinica*, 220 Neb. 792, 372 N.W.2d 445 (1985); *State v. Merithew*, 220 Neb. 530, 371 N.W.2d 110 (1985); *State v. Groves*, 219 Neb. 382, 363 N.W.2d 507 (1985).

The appellant claims that § 2-1221 is overbroad because it reaches a substantial amount of constitutionally protected conduct. The conduct purportedly infringed upon includes the right to freely contract and equal protection of the law.

As stated above, contract rights are not absolute and may be subject to regulation in the common interest. *Nebbia v. New*

*York*, 291 U.S. 502, 54 S. Ct. 505, 78 L. Ed. 940 (1934). In this instance we conclude that messenger service activities are so intertwined with gambling that the state may regulate and even prohibit the activity if the legislation is reasonably related to legitimate state ends. Because there is a reasonable relationship in this case, we determine that the messenger service activities are not constitutionally protected. In terms at least of contract rights, the statute does not reach a substantial amount of constitutionally protected conduct.

For reasons to be discussed later, the statute is not overbroad because it denies the appellant equal protection of the law. The statutory discrimination upon which the appellant bases its claim simply does not exist.

Since there is no merit to the overbreadth argument, we turn to the question of vagueness. The appellant acknowledges that, under our recent cases, it has no standing to challenge § 2-1221 because the statute clearly proscribes conduct sought to be engaged in by the member messenger services. See, *In re Interest of Siebert, supra; State v. Groves, supra; State v. Ruzicka*, 218 Neb. 594, 357 N.W.2d 457 (1984); *State v. Frey, supra.*

We are not persuaded by the appellant's argument that *Kolender v. Lawson*, 461 U.S. 352, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983), requires that we overrule this line of cases. In the *Kolender* case the Court concluded that a California statute was unconstitutionally vague because it required wandering or loitering persons to provide "credible and reliable" identification upon request by a police officer. The majority held that the statute was impermissibly vague because the "credible and reliable" language vested complete discretion in the police to determine whether the suspect satisfied the statute, and was therefore subject to arbitrary enforcement. An issue raised by Justice White's dissent was whether, under *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982), a statute in all its applications must be vague to be facially invalid. The majority's discussion of this matter in note 8 did not eliminate the standing requirement. *Kolender, supra* at 360. Although the opinion indicates that, pursuant to the challenged statute, Lawson was

arrested on 15 occasions, prosecuted twice, and convicted once, there is no indication that his conduct was ever clearly proscribed. It is difficult to perceive how it ever could have been, given the statute's lack of minimal guidelines to govern its enforcement.

The present case is unlike *Kolender* in that the appellant's conduct is clearly proscribed. The appellant cannot therefore be heard to complain of the statute's vagueness as applied to others. *In re Interest of Siebert, supra*.

Finally, the appellant claims that § 2-1221 violates equal protection of the law pursuant to the Nebraska and federal Constitutions. Neb. Const. art. III, § 18, and U.S. Const. amend. XIV. The basis of this argument is that § 2-1221 prohibits "messenger services from accepting wagers for delivery to race tracks within Nebraska, but not to race tracks outside of Nebraska." Brief for Appellant at 19. From our reading of the statute, such a discrimination does not exist, because the first portion of § 2-1221 provides: "[W]hoever directly or indirectly, accepts anything of value to be wagered or to be transmitted or delivered for wager in *any* parimutuel or certificate system of wagering on horseraces . . . shall be guilty of a Class II misdemeanor." (Emphasis supplied.)

The phrase omitted from the aforementioned passage proscribes delivery of anything of value received outside a licensed Nebraska racetrack for wagering therein. Thus, the statute does in fact proscribe the activities of messenger services within the state, whether the service is to deliver a wager in or out of the state.

Statutory language should be given its plain and ordinary meaning, and where the words of a statute are plain, direct, and unambiguous, no interpretation is necessary to ascertain their meaning. *Sorensen v. Meyer*, 220 Neb. 457, 370 N.W.2d 173 (1985). The plain language of § 2-1221 prohibits acceptance of value for wagering at any racetrack, not just licensed Nebraska tracks. The provision of the statute referring to delivery of wagers to Nebraska tracks is necessarily limited to those tracks because it would be beyond this state's police power to regulate conduct occurring in another state. There is no basis for the appellant's equal protection argument.

The order of the district court sustaining the demurrers of the defendants was not erroneous. The judgment is, therefore, affirmed.

AFFIRMED.

KRIVOSHA, C.J., dissenting.

For reasons more fully set out in my dissents in *Pegasus of Omaha, Inc. v. State*, 203 Neb. 755, 280 N.W.2d 64 (1979), *State v. Groves*, 219 Neb. 382, 363 N.W.2d 507 (1985), and *In re Interest of Siebert, ante* p. 454, 390 N.W.2d 522 (1986), I must respectfully dissent from the decision rendered by those members of the court who have today affirmed the action of the district court in sustaining demurrers filed by the state and, in effect, finding Neb. Rev. Stat. § 2-1221 (Cum. Supp. 1984) constitutional.

Turning first to the vagueness argument addressed by the majority, I continue to be convinced that we have created a rule unique to Nebraska and not even followed by the U.S. Supreme Court, upon whom we base our original decision. In *State v. Groves, supra,* I set out at length note 8 from the case of *Kolender v. Lawson*, 461 U.S. 352, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983), and will not repeat it here. As I read the note, the holding in *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982), was rejected and cannot be so lightly disposed of by us in merely saying that insufficient evidence was presented. Lawson was permitted to bring a civil declaratory judgment action, and further permitted to raise the vagueness argument, though there was no evidence that anyone had ever asked him for identification and refused to accept it. Unfortunately, we continue to pursue this line of cases relying upon *Hoffman Estates, supra,* to the extent that we have effectively eliminated in Nebraska the right to contest the constitutionality of a statute on the basis of vagueness.

I further continue to believe that the statute in question cannot be sustained as a constitutional act of the Legislature. Once the state permits parimutuel betting, then how the money arrives at the track cannot be limited under the guise of the police power. Section 2-1221 does not regulate gambling or even parimutuel betting. Rather, it insists that every person who

places a bet at a track must himself or herself be present to place that bet. How the individual's presence or the payment of a fee to enter the track can be said to be a matter of public health, safety, or welfare once parimutuel betting is permitted is simply beyond my comprehension.

Those members of the court who have upheld the constitutionality of the act in question rely in part upon language found in *Finish Line Express, Inc. v. City of Chicago*, 72 Ill. 2d 131, 140, 379 N.E.2d 290, 293 (1978), which reads: "[I]t is clear that the State may utilize its police power to protect its sources of revenue and assure collection of taxes." The language of the Illinois decision is interesting, to say the least. It reads in part at 139-40, 379 N.E.2d at 293:

> As we noted earlier, the report of the Legislative Investigating Commission indicated that many of the messenger services book some of the bets themselves or book them with an illegal wire room, causing a substantial decrease in the total bets handled at the tracks and a corresponding loss of privilege-tax revenue. In addition the State suffers from the activities of those messenger services which actually take the bets to the track, for bettors need no longer attend the track in order to wager. Not only does admissions-tax revenue decline, but there is a reduction in the total bets and the tax revenue because, the report indicates, winning bettors, not being present at the track, cannot wager their winnings as many would otherwise do. These problems alone justify the legislative action here challenged since it is clear that the State may utilize its police power to protect its sources of revenue and assure collection of taxes.

It is difficult for me to perceive that it is in the public's health, safety, or welfare to be certain that winners are in a position where they may gamble away their winnings or that rules should be prescribed so that individuals may not limit their losses but may be induced to continue betting in hopes of either "getting even" or "hitting it big." It appears to me that the purpose of § 2-1221 has nothing to do with regulating gambling but, rather, is intended solely to ensure that both the tracks and the state realize as much revenue as possible. That is not within the

police power of the state. As I did in *Pegasus of Omaha, Inc. v. State, supra,* I would have declared the act unconstitutional. I do so not because I favor gambling or even parimutuel betting. Rather, I do so because I believe granting to the state the right to prohibit legitimate businesses under the pretext of the police power is a dangerous mistake.

WHITE, J., dissenting.

I dissent for the reasons set forth in the dissent in *Pegasus of Omaha, Inc. v. State,* 203 Neb. 755, 280 N.W.2d 64 (1979).